Filed 11/24/25  In re F.P. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re F.P., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>F.P.,<br><br>    Defendant and Appellant. | F088221<br><br>(Super. Ct. No. JW089345-01)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Marcus Cuper, Judge.

Karriem Baker, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen, and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In 2000, appellant was sentenced to life in prison without the possibility of parole after being tried as an adult for two murders he committed when he was 17. In 2021, his sentence was recalled under Penal Code section 1170, subdivision (d). The prosecution filed a motion to again transfer appellant's case from juvenile court to criminal court. The court granted the motion, and appellant challenges that ruling on appeal.

We conclude that the court misapprehended one aspect of its discretion, reverse the order transferring appellant to criminal court, and remand for reconsideration of the issue.

## BACKGROUND

On July 23, 1999, the District Attorney of Kern County filed a juvenile wardship petition alleging appellant, then age 17, came within the jurisdiction of the juvenile court under Welfare and Institutions Code section 602. The parties agree that appellant was alleged to have committed two counts of murder, each of which was enhanced by allegations under Penal Code[1] sections 12022.53, subdivision (d) and section 12022.5, subdivision (a)(1).[2] According to a subsequent brief by the prosecution, the court granted a request to transfer appellant to adult criminal court.

On November 29, 1999, the District Attorney of Kern County filed an information charging appellant with two counts of premeditated murder (counts 1–2; § 187, subd. (a)), each of which was enhanced by a multiple-murder allegation (§ 190.2, subd. (a)(3)) and a firearm enhancement (§ 12022.53, subdivision (d).) A jury convicted appellant on both murder counts and found the enhancements true.

The court sentenced appellant to life without the possibility of parole on count 1, plus 25 years for the gun enhancement, plus a concurrent term of life without the

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

[2]     The 1999 wardship petition we located in the record did not include the counts alleged with respect to appellant.

2.

possibility of parole on count 2, plus 25 years for the gun enhancement to that count. We affirmed the judgment in an unpublished opinion in 2002. (See *People v. [F.P.]* (Feb. 22, 2002, F035229) [nonpub. opn.].)

In 2007, appellant attacked an inmate in the prison yard and was convicted of attempted murder, aggravated assault with a deadly weapon by an inmate serving a life sentence, assault with a deadly weapon by an inmate, and being an inmate in possession of a sharp instrument. In an opinion filed in 2011, we reversed appellant's conviction for assault with a deadly weapon by an inmate but affirmed the other three convictions. (*People v. [F.P.]* (Mar. 30, 2011, F058532) [nonpub. opn.].)

On July 29, 2021, appellant filed a petition for recall and resentencing (§ 1170, subd. (d)(2)) with respect to his murder convictions. The court ruled the case would go to juvenile court where the prosecution could move to transfer the matter back to criminal court.

On January 27, 2022, the prosecution filed a motion to transfer the matter to criminal court. Beginning on May 29, 2024, the court conducted an evidentiary transfer hearing. At the conclusion of the hearing, the court granted the transfer motion.

## FACTS

### I.     Facts from Appellant's Murder Trial.[3]

When appellant was 17, he lived in Bakersfield with his older sister Elizabeth and her two small children. Their younger sister, Dianna, also stayed at the house on occasion. Their mother and other siblings lived a few blocks away.

At around 6:00 p.m. on the evening of July 21, 1999, three of Elizabeth's friends came to the house to visit: Gabriel Salcido, Edward Gonzales, and Andrew Martinez. They stayed there for the next several hours drinking beer, talking, and listening to music.

---

**3**      These facts are taken from our opinion in *People v. [F.P.]*, *supra*, F035229).

3.

Appellant remained across the street at a neighbor's house for most of this time, returning home now and then only to grab a few beers.

There was some noticeable tension between appellant and Gonzales. Appellant suspected Gonzales was one of the people who had jumped him some time in the past, so he refused to shake Gonzales's hand. Gonzales, according to appellant, stared at him whenever he went to the house and complained appellant was taking too much beer. At some point later that evening, the two men talked outside. Gonzales evidently convinced appellant he was not the person who had jumped him, and the two men shook hands. All three men—Salcido, Gonzales, and Martinez—left the house around 12:45 a.m. the next morning in Salcido's car. As planned, Salcido and Gonzales dropped off Martinez at his house, bought some more beer, and then went back again to Elizabeth's house, arriving there shortly after 1:00 a.m.

About this same time, right next door to Elizabeth's house, Amber Lee was just falling off to sleep in the upstairs front bedroom, where she was spending the night with her boyfriend. She heard five gunshots in rapid succession: two shots, a brief pause, and then three more. She looked out the window to see appellant walking from the front of the house to a car parked in the driveway. He was followed soon afterward by his brother Miguel, who was wearing gloves. Appellant drove the car into the garage and closed the door. Lee went back to bed.

Before long, Lee heard another noise and looked out the window again. This time she saw appellant's sister, Analeticia, dump a large trash bag full of glass into the garbage can and return to the house. Lee laid down again, only to get up once more in time to see a car pulling away from the front of the house. Lee called her sister to report what she had seen, who, in turn, had her husband call 911.

The officers who responded to the call found blood and tissue evidence near the front door of the house and drag marks leading to the garage, where they found the dead bodies of Salcido and Gonzales piled into the back seat of Salcido's car. A garbage bag

4.

containing bloody clothes and shoes was found in a hole underneath a doghouse in the backyard, along with Salcido's cell phone. There were five expended shotgun shells and one live shell on the ground between the house and garage. The police later found the murder weapon hidden behind a metal box in the garage: a 20-gauge, pump-action shotgun capable of holding five shells in the magazine and one in the chamber.

An autopsy revealed that Gonzales had been killed by a single shotgun blast to the back of his head, in the neck area just below his skull, fired from an estimated range of five or six feet. It had cut his spinal cord and severed several major blood vessels, causing immediate death. He had a blood-alcohol level of 0.14 percent. Salcido also was killed by a single shotgun blast, which had been fired from a distance of about six to eight feet in front of him; it entered the left side of his head above the ear and "essentially blue [*sic*] the brains out of the head." Salcido's blood-alcohol level was 0.17 percent.

In the afternoon of the day of the murders, Detective Lyle Martin got a phone call from the Barstow Police Department saying appellant and his sister, Analeticia, had turned themselves in to authorities there. Detective Martin drove to Barstow, where he arrested both appellant and his sister after first interviewing them. A videotape of his interview with appellant was played for the jury, accompanied by a transcript.

In the interview, appellant said Gonzales got mad at him for refusing to shake his hand. "So towards the end of the night he started tripping on me so, I got mad and asked them to leave, he won't leave, and he went outside, and I went into my garage and I ended up taking out a gauge and I fuckin' went to him and told him to leave. He didn't listen."

At first, according to appellant, Salcido also urged Gonzales to leave, but later he sided with Gonzales against appellant. This confrontation occurred outside the front door, sometime after Salcido and Gonzales returned the second time from buying more beer. By then, appellant said everyone in the house was asleep, and he wanted to go to sleep too. But Gonzales refused to leave, called him names, and tried to provoke a fight.

5.

"He would have kicked my ass." Appellant, who was "[r]eally drunk," got the shotgun just to scare Gonzales away. Instead, "[h]e [Gonzales] thought I was just messing with him. [He said,] 'What are you going to do with it.' 'What are you going to do.' Then started walking towards the door.… [¶] … and I shot him." At that point, Salcido turned around and rushed at appellant, so appellant shot him too. Then, by appellant's account, he shot each man once more on the ground and continued to fire until the shotgun ran out of shells.

Appellant moved Salcido's car into the garage, dragged the two bodies over to the car, put them into the back seat, and began hosing blood off the walkway. Just then Analeticia and Miguel drove up. Appellant finished cleaning, hid the shotgun back in the garage, put his bloody clothes in a trash bag, and threw it and Salcido's cell phone under the doghouse. He and Analeticia dropped off Miguel at their aunt's house and then headed south in Analeticia's car through Barstow. But appellant eventually had a change of heart, and they turned back. "I didn't want to run. I was like, I need to stay and face the consequences I guess. I know wht [*sic*] I did wasn't right. There is no reason why you should kill somebody.…"

Appellant testified in his own defense. He gave much the same account of events as he had given to Detective Martin in Barstow. He said he remained outside the house from the time Salcido and Gonzales left to buy beer (around 10:00 p.m.) until they came back at 1:00 a.m. He was smoking cigarettes and "thinking about things." He explained he got scared once he realized Gonzales was not intimidated by the shotgun, because both Gonzales and Salcido were bigger than him, they were going into the house, and he was concerned about his family.

## II. Facts from Appellant's Prison Assault Trial.

At approximately 10:27 a.m. on April 25, 2007, Corcoran State Prison Correctional Officer Todd Cogdill was observing inmates in the prison yard from an armed post located 14 to 15 feet above the yard. He had access to a 40-millimeter direct

impact rifle that shoots a blue foam rubber tip round, which is a nonlethal weapon, and a mini-14 rifle, which is a lethal weapon.

Video taken that morning by a camera located about six feet above Officer Cogdill showed prison inmates Avelar and Salvador Verduzco standing next to each other along a wall, with Avelar to Verduzco's right, when appellant walked over to the two and stood next to Verduzco, on his left. After about 20 seconds, appellant began striking Verduzco on the head and neck in a hitting and stabbing motion. Cogdill estimated appellant struck Verduzco in the neck and upper back 10 or more times, but he did not see anything in appellant's hands.

Upon seeing the attack, Officer Cogdill immediately yelled, "[G]et down" several times and grabbed the direct impact rifle. When none of the inmates complied by getting down in a prone position, Cogdill fired a round at appellant's thigh, but missed. While reloading the direct impact rifle and yelling, "[G]et down," Cogdill saw Verduzco, who had blood on his back and neck, break away from appellant and run along the wall towards Cogdill. Appellant pursued Verduzco, with Avelar following the two; before Avelar did so, he made eye contact with Cogdill.

The conflict continued out of the camera's view. Officer Cogdill could see that appellant and Avelar resumed the attack on Verduzco, who was curled up in a corner against the wall with his hands over his head and neck, which had a lot of blood on them. Cogdill took another shot at appellant with the direct impact rifle but was not sure if he hit him. Cogdill saw Avelar strike Verduzco in his head and neck area with hitting and stabbing motions, but did not see anything in Avelar's hands. Appellant never stopped attacking Verduzco; when Avelar joined the attack, he would hit and backup, hit and backup. Cogdill then fired a third direct impact round, which hit Avelar in the left shoulder. Although appellant and Avelar backed away from Verduzco, they began advancing toward him again.

7.

Based on the severity and life-threatening nature of the attack and fearing for Verduzco's life as he was no longer defending himself, Officer Cogdill chambered his lethal weapon and got into position to shoot either Pimentel or Avelar if they resumed the attack. When he chambered the weapon and brought it to his shoulder, "they got down." He had appellant and Avelar prone out and opened the sally port door to the yard so Verduzco could receive medical attention. Cogdill saw an object lying about four feet behind appellant's foot, but did not see how the object got there. The video showed an item tossed around the yard that Cogdill believed was a weapon. As he watched, he saw the object being passed by inmates on the yard. A handle, which Cogdill believed to be the weapon, was later found by a storm drain.

Sergeant Eric Lawton came to assist. As he scanned the yard, he saw Avelar get up and throw something at the wall and return to the prone position. He heard the object explode; it sounded like glass. When Lawton inspected the yard, he found small pieces of bloody glass in the area along the wall.

After the incident, Officer Cogdill saw some blood on Avelar's left hand. When examined, Avelar had blood on his hands, left bicep and chin; he also had what looked like a graze on his left knee. Appellant had blood on his hands, a minor cut on one of his fingers and abrasions on his knuckles. Verduzco had numerous stab wounds all over his upper body, which would require sutures, and he was covered in blood.

Avelar testified that he and Verduzco were standing together when appellant walked up and started talking to Verduzco. Avelar did not pay attention to the conversation. A few seconds later, Avelar looked to his side and saw appellant attacking Verduzco with an object that looked like it had a "little black" on it with an inch and a half-length of glass. When Avelar saw the object in appellant's hand and that he was not stopping the attack, Avelar thought appellant would kill Verduzco unless he intervened. Avelar tried to break up the attack by putting himself between the two, with his face toward Verduzco and his back toward appellant, but appellant did not stop trying to strike

8.

Verduzco. Although Avelar had his back to appellant, he did not think that appellant would attack him.

Avelar saw the handle of appellant's weapon fly out of appellant's hand. Appellant was still holding the piece of glass, with which he continued to strike Verduzco. After Avelar was shot in the shoulder, appellant stopped his attack. When Avelar proned out, he saw a piece of broken glass near appellant. Avelar heard appellant say, "I'm not going to have a broken piece by me," and saw appellant get up from his prone position and throw the glass against the wall before returning to a prone position. Avelar denied ever hitting Verduzco or having an object in his hands at any time; he also denied getting up after he proned out. Avelar claimed he got blood on his hands when appellant pushed him into Verduzco.

Appellant did not testify or present evidence.

### III. Transfer Hearing Evidence.

Relatives of the two victims testified at the transfer hearing. Salcido's brother testified that Salcido's death has caused him depression and anxiety. Even 25 years later, "it's still a nightmare" and "never got any easier." Salcido's brother hoped appellant would never have an opportunity to destroy another family.

Gonzales's daughter testified that she was five years old when Gonzales was killed. She said Gonzales had been "the best dad" and her best friend. She told her mother she wished she was dead so she could see Gonzales again. She has suffered sadness or depression her whole life because of Gonzales's death.

A mental health therapist named Krissy Bynum testified for appellant. She had a master's degree in social work and a license in clinical social work. The defense asked Bynum to perform a biopsychosocial assessment of appellant. Bynum concluded that at the time of the offense, appellant was a juvenile and had "not reach[ed] full maturity." She also concluded appellant is remorseful.

9.

Bynum testified appellant was exposed to domestic violence as a child, and his father was very aggressive and would drink. When appellant's father would drink, the environment was "very toxic." When appellant tried to intervene on his mother's behalf, father would assault him. Appellant's mother had to take appellant and his siblings to live in a shelter for a few months.

Appellant told Bynum that when he was four years old, he went on a camping trip with his father and mother's cousin. Appellant told his mother's cousin he would shoot him in the arm. Appellant's father told him he needed to follow through with his threat. Appellant said that "with the assistance of his father, he then shot his mother's cousin in the arm." Appellant's father told him to say the mother's cousin was shot in a hunting accident.

Appellant told Bynum he grew up in a low-income area.

Appellant's father died in a solo vehicle DUI crash when appellant was nine years old. Appellant's mother had to raise appellant and his five siblings and became a field worker. Appellant had to take on a different type of role, being asked to ensure his siblings got to school on time, meal preparation, etc. However, appellant exhibited self-doubt and low self-esteem. He attended school less, became gang affiliated and abused substances. Appellant reported his highest level of education was completion of sixth grade but also reported attending high school. In high school, appellant drank excessively and used drugs including PCP, methamphetamine, cocaine and LSD. He dropped out of school in the 10th grade.

Bynum expressly testified she could not diagnose appellant because she was not his therapist. However, she indicated that she provided a "presumed" diagnosis. Her report reflected diagnoses of "Major Depressive Disorder, Recurrent Episode, Moderate," "Generalized Anxiety Disorder," "Posttraumatic Stress Disorder," "Alcohol Use Disorder, Moderate, in sustained remission, in a controlled environment," and "Stimulant Use Disorder, Moderate, in sustained remission, in a controlled environment."

In her report, Bynum indicated that an individual's brain does not reach full maturity until age 25. Bynum testified that trauma, PTSD, alcohol abuse and stimulant abuse can stunt developmental growth. Trauma can result in poor self-regulation and poor decision making.

Appellant told Bynum that he really started understanding his choices around the age of 32. Around that time, appellant started completing courses on substance abuse and mentoring younger people.

Bynum only met with appellant once and it was for about one hour. Bynum admitted that during these assessments she is at the mercy of the person as to whether they tell her the truth or not.

Bynum did not recall appellant admitting he had killed the family dog. Appellant did not tell her he committed crimes for the Mexican Mafia while in prison.

Bynum did not know whether appellant's recent indications of remorse had anything to do with appellant learning he might become eligible for parole. Bynum recommended that appellant remain in juvenile court. She asserted that the adult prison system is meant to treat adults exclusively.

## IV. Custodial Rules Violations.

Appellant had a substantial history of rules violations while in custody:

| Date | Description |
|------|-------------|
| 10/2/2000 | Active participation in disturbance |
| 3/16/2001 | Unlawful assembly |
| 1/4/2003 | Possession of tattoo paraphernalia |
| 3/16/2003 | Possession of deadly weapon |
| 5/10/2003 | Willfully obstructing peace officer |
| 5/30/2003 | Willfully disobeying direct order |

11.

| 10/18/2004 | Disobeying a direct order |
| --- | --- |
| 10/28/2006 | Possession of a deadly weapon |
| 4/25/2007 | "Battery on an inmate" (resulting in attempted murder conviction discussed above) |
| 3/15/2011 | Possession of a razor blade |

## V.  Custodial Course Certificates.

Appellant also completed several courses in custody, receiving certificates for the following courses:

| Date | Course |
| --- | --- |
| 2/11/2015 | Anger Management Home Study Program |
| 2/23/2015 | Substance Abuse Home Study Program |
| 11/27/2015 | Home Bible Study Course |
| 4/27/2016 | High School Equivalency Certificate |
| 5/3/2016 | 30 Days in Narcotics Anonymous |
| 6/7/2016 | 60 Days in Narcotics Anonymous |
| 7/14/2017 | Self-Help, Parenting |
| 4/2/2019 | Anger Management CLN |
| 4/2/2019 | Victim Awareness CLN |
| 4/24/2019 | Parenting with Love Logic CLN |
| 5/3/2019 | Stress Management CLN |
| 5/3/2019 | The 5 Secrets to Finding a Job CLN |
| 5/29/2019 | Life Skills Series 1 CLN |
| 6/7/2019 | Life Skills Series 2 CLN |
| 6/17/2019 | Money Management CLN |

| 6/20/2019 | Life Skills Series 3 CLN |
|---|---|
| 6/20/2019 | Focus on ReEntry CLN |

The staff sponsor of the Narcotics Anonymous sessions indicated appellant was an active participant and showed a commitment to help himself. A letter dated October 3, 2019, indicated appellant displayed "great work ethics and positive behaviors" while serving as a tutor helping inmates learn English Language Arts. Appellant was employed for substantial periods while in custody and received positive evaluations. Appellant paid the $15,983.52 restitution ordered by the court.

## VI.    Probation Report.

Appellant's probation report indicated he had prior "referrals" on July 15, 1996, and May 11, 1999, each related to a "charge" of public intoxication (§ 647, subd. (f).) Both matters were "referred to diversion," which "failed." The probation report also lists referrals that were closed after investigation.

The probation report also included a statement from appellant's neighbor indicating he once put his dog in the trunk of his vehicle, drove to a nearby field, tied the dog up with a rope, and shot and killed the dog to "test out" his new gun. Once that occurred, the neighbor stopped speaking with appellant.

## VII.   Court Ruling.

The court granted the prosecution's request to transfer appellant to criminal court. It began its ruling as follows,

> "The issue before the Court today is has the Petitioner proven by clear and convincing evidence that the subject is not amenable to rehabilitation while under the jurisdiction of the juvenile court. This is not a typical transfer hearing, because [appellant] sits here today at age 42. So the question we're really looking at is has the Petitioner proven by clear and convincing evidence that the subject would not have been amenable to rehabilitation while under the jurisdiction of the juvenile court which ends at age 25."

The court employed the factors listed in Welfare & Institutions Code section 707, subdivision (a)(3), in making its decision, and explained its reasoning as to each factor.

A.    *First Factor*.

The first factor the court discussed as the degree of criminal sophistication exhibited by the minor.  (Welf. & Inst. Code, § 707, subd. (a)(3)(A)(i).)  The court expressly cited appellant's traumatic upbringing, Bynum's testimony about impulse control development, appellant's killing of the family dog, and the circumstances of the killings for which he presently was charged.  With respect to killing the family dog, the court observed "[t]hat particular act, one of cruelty and indicative of premeditation, creates an inference that he intended to kill someone with it.  He could have shot at a beer can or a paper plate and learned that that gun worked."  With respect to the killing of Salcido and Gonzales, the court observed that appellant tried to hide evidence and initially fled the scene, which indicated he "did not act with impetuosity and that he appreciated the risks and consequences of his actions."  Also, there was an appreciable amount of time between the event that precipitated the tension between appellant and the victims, and appellant's act of killing them.  The locations of the gunshot wounds "indicates a predatory act rather than one indicating a need for defensive measures."  Appellant was just three months shy of his 18th birthday when the shooting occurred.  The court concluded the first factor favored transfer to adult court.

B.    *Second Factor*.

The court then considered the second factor, "whether the subject can be rehabilitated prior to the expiration of the juvenile court's jurisdiction."  (See Welf. & Inst. Code, § 707, subd. (a)(3)(B)(i).)  The court began its analysis by stating, "So we're looking at a relevant time frame of -- from the time the crime was committed when he was almost 18 until he turned 25 on October 30th, 2006, and at that point, the Court's jurisdiction would end."  Later, the court observed, "The question, though, is at what point would he have been rehabilitated, and the number we're looking at is age 25.  And

14.

in considering factors, in evaluating his criteria, I'm looking at conduct up to 25 as well as beyond age 25, because if he were still committing crimes in his mid 20s to early 30s, it's more likely that he's going to be not rehabilitated by the age of 25."

The court recited much of appellant's crimes and rules violations committed while in custody, including incidents from when appellant was age 22, 25, and 31. The court also noted that appellant was gang oriented, which makes it less likely he would rehabilitate.

The court continued,

> "Of significance to the Court was the testimony of Krissy Bynum who testified that Mr. [P.] did not start the process of self-reflection and understanding the consequences of his choices until around age 32. This indicates to the Court that he would not likely have been amenable to rehabilitation by the age of 25."

The court acknowledged that appellant was exposed to trauma in his upbringing and that was not his fault. However, that trauma would mean appellant would "need that much more rehabilitation than the person who wasn't exposed to such trauma."

Finally, the court stated,

> "The Court received evidence that Mr. [P.] completed a variety of programs and classes while in prison including anger management, home study, substance abuse, life skills, money management, stress management, victim awareness, and others. Those programs, though, were completed after the age of 25. So there's no question before the Court that Mr. [P.] has grown as an adult, but the question was whether or not he would have -- that growth would have occurred before age 25, and the evidence that the Court considered at this hearing indicates his growth occurred well past the age of 25 …."

The court concluded the second factor favors transfer to adult court.

## C.     *Third Factor*.

The court proceeded to the third factor, which it summarized as "cover[ing] the minor's previous delinquent history including the seriousness of the minor's previous

offenses as well as the effect of the minor's family and community environment and childhood trauma on his previous delinquent behavior."

The court began,

> "So looking at the previous delinquent history, at age four, we heard evidence that Francisco was urged to commit a shooting by his father. In 1996 at age 14, he committed a -- what sounds to be a Penal Code Section 32, an accessory after the fact. He was present when his sister shot her boyfriend in the leg and helped conceal the crime by disposing of the gun. He was twice arrested in 1998 for public intoxication. Not a very serious offense. He was referred to diversion both times but failed the diversion program both times.

> "He was arrested for carjacking in 1998, and he was seen driving a car that had been carjacked from the victim two hours earlier. There was no evidence linking him to the actual assault on the victim in that case. He was just seen driving the car after it was taken. And the Court is also considering the shooting of the dog which occurred shortly before the murders in this case."

The court acknowledged that most of appellant's violent acts were committed with family members or at the urging of his father. The court noted that appellant was in a negative community and family environment. The court stated the third factor was a "closer call" and "seems" to favor retention in juvenile court.

## D. *Fourth Factor.*

The court then considered the fourth factor, "success of previous attempts by the juvenile court to rehabilitate the minor." The court observed that "[t]here were only very minor attempts at rehabilitation in the juvenile system for" appellant. They included "prevention services which are minimal, but he failed them." The court concluded the fourth factor did not "move the needle in one direction or another."

## E. *Fifth Factor.*

Finally, the court reached the fifth factor – "the circumstances and gravity of the offense alleged in the petition to have been committed by the minor. And here we're

looking at the actual behavior of the subject, his mental state, his degree of involvement in the crime, the level of harm actually caused, and the person's mental and emotional development."

The court stated appellant was the lone perpetrator of two horrific murders. There was no justification for violence, even a fistfight. Appellant had plenty of time to think about his actions before pulling the trigger. While appellant was intoxicated, he "had enough wits about him to know to get family involved to help him to clean up the crime scene in an attempt to cover up his actions."

Appellant's actions caused "catastrophic" harm, destroying two families. The court referenced the victims' family members' testimony about how the deaths affected them.

The court concluded the fifth factor favored transfer to adult court.

The court ultimately concluded, after "viewing everything," that the People had proven by clear and convincing evidence that appellant was not amenable to rehabilitation while under the jurisdiction of the juvenile court. Appellant challenges this ruling on appeal.

## DISCUSSION

### I. The Court Erroneously Believed Juvenile Jurisdiction Ended When Appellant Turned 25, Requiring Reversal and Remand

#### A. *Law.*

In order to transfer a minor from juvenile court to criminal court, the court must "find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (Welf. & Inst. Code, § 707, subd. (a)(3).) In making this decision, the court must consider five statutory factors: (1) the degree of criminal sophistication exhibited by the minor; (2) whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction; (3) the minor's previous delinquent history; (4) success of previous attempts by the juvenile

17.

court to rehabilitate the minor; (5) the circumstances and gravity of the offense alleged in the petition to have been committed by the minor.  (*Id.*, at subds. (a)(3) & (a)(3)(A)–(E).)

When the appellant presents an issue of statutory interpretation, we review it de novo. (*In re Noah S.* (2021) 67 Cal.App.5th 410, 414.)

**B.     *Analysis.***

Appellant contends the court erred in concluding that juvenile jurisdiction would have terminated when he turned 25 years old.  The Attorney General argues the issue has been forfeited.

In written opposition to the transfer motion, defense counsel addressed each of the five statutory factors.  In the discussion of the second factor specifically, defense counsel argued that because appellant was 17 years at the time of the offense, "the court would have had 8 years of jurisdictional time [] or […] if he were committed to the Division of Juvenile Facilities, 8 years of custody and jurisdictional time - confinement up to age 25. (Welf. & Inst. Code, § 1769, subd. (c))."  The defense expressly represented to the court, in the specific context of the second factor, that jurisdiction would last eight years until appellant was 25.

However, in the context of forfeiture, courts have made a distinction between claims a court erroneously exercised its discretion versus claims a court misapprehended its discretion.  (See *People v. Panozo* (2021) 59 Cal.App.5th 825, 840.)  The cited cases do not explain in any detail *why* this distinction should make a difference with respect to forfeiture.  Nonetheless, and in order to forestall appellant's claim of ineffective assistance, we will address the claim on its merits.

When the court considered the second factor, it stated that juvenile jurisdiction would have ended when appellant turned 25 years old.  However, that is incorrect.  "The [juvenile] court may retain jurisdiction over a person who is 25 years of age or older for a period not to exceed two years from the date of disposition if the person is found to be a person described in Section 602 by reason of the commission of an offense listed in

18.

subdivision (b) of [Welfare and Institutions Code,] Section 707."[4] (Welf. & Inst. Code, § 607, subd. (d).)

The Attorney General responds that courts are presumed to apply the law, and that the court's "isolated" remarks here do not overcome the presumption. However, the court's remarks were not isolated at all. They were integral to its analysis. The court began its consideration of the second factor by setting out the following: "So we're looking at a relevant time frame of -- from the time the crime was committed when he was almost 18 until he turned 25 on October 30th, 2006, and at that point, the Court's jurisdiction would end."

The Attorney General notes that the court actually did consider appellant's conduct after he turned 25. That is true, but it considered that conduct for the express purpose of determining whether appellant would have been rehabilitated *by age 25*. The court made this clear several times, stating:

> "The question, though, is at what point would he have been rehabilitated, and the number we're looking at is age 25. And in considering factors, in evaluating his criteria, I'm looking at conduct up to 25 as well as beyond age 25, *because* if he were still committing crimes in his mid 20s to early 30s, it's more likely that he's going to be not rehabilitated *by the age of 25*." (Italics added.)

Finally, the Attorney General argues that even if the court only considered appellant's conduct before age 25, there would be nothing wrong with that approach. This elides the core problem with the court's approach. The central problem is not that it failed to consider appellant's *conduct* after age 25 but rather that it only considered conduct to determine whether appellant would have been *rehabilitated by age 25*. In fact, the court should have considered whether appellant could have been rehabilitated two

---

**4**      Murder is one of the offenses listed in that subdivision. (Welf. & Inst. Code, § 707, subd. (b)(1).)

years after his then-upcoming disposition in juvenile court, which would have presumably occurred when appellant was in his *forties*.

And the court was quite clear that its consideration of the second factor was always directed at determining whether appellant would have been rehabilitated by the age of 25:

> "Other facts that were important to the Court when evaluating this criteria were the fact that he was gang oriented which makes it less likely to the Court that he would be rehabilitated *by age 25*." (italics added)

Shortly thereafter, the court reasoned,

> "Of significance to the Court was the testimony of Krissy Bynum who testified that Mr. [P.] did not start the process of self-reflection and understanding the consequences of his choices until around age 32. This indicates to the Court that he would not likely have been amenable to rehabilitation *by the age of 25*." (Italics added.)

The court concluded its analysis of the second factor by stating,

> "The Court received evidence that [appellant] completed a variety of programs and classes while in prison including anger management, home study, substance abuse, life skills, money management, stress management, victim awareness, and others. *Those programs, though, were completed after the age of 25*. So there's no question before the Court that [appellant] has grown as an adult, *but the question was whether or not he would have -- that growth would have occurred before age 25*, and the evidence that the Court considered at this hearing indicates *his growth occurred well past the age of 25*, and the Court believes the second factor favors transfer to adult court." (Italics added.)

In sum, the court's references to a jurisdictional cutoff at age 25 were anything but isolated and clearly played a central role in its consideration of the second factor. We will next consider whether this error was prejudicial.

**C.    *Prejudice*.**

The parties agree that the applicable standard to the type of error alleged here is that reversal is required "unless the record 'clearly indicate[s]' that the trial court would

20.

have reached the same conclusion even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

Here, the court did not express how it would have ruled had it known juvenile jurisdiction could have lasted longer. And one of the few comments the court made about appellant's post-age 25 conduct, cuts against a finding of harmlessness: "[T]here's no question before the Court that [appellant] has grown as an adult, but the question was whether or not he would have -- that growth would have occurred before age 25, and the evidence that the Court considered at this hearing indicates his growth occurred well past the age of 25 .…"

The Attorney General does note that some of the other factors, largely unaffected by the error, militated in favor of transfer. However, the trial court retains the discretion to weigh the various factors bearing on the transfer decision. And the court did not "clearly indicate" how much weight it would have given the second factor if it had properly understood that factor. While it is entirely possible that the trial court would have still granted the transfer if it had understood the second factor fully, we cannot say the record clearly indicates that.

The Attorney General contends appellant does not contest on substantial evidence grounds the court's conclusion that the second factor weighed in favor of transfer. But the presence of substantial evidence is not dispositive when it is used to answer the wrong question. We acknowledge that there was substantial evidence upon which the court could find appellant would not have been rehabilitated by age 25. But that fact is immaterial because that was not the question presented by the second factor. The correct question was whether appellant could be rehabilitated prior to the expiration of the juvenile court's jurisdiction, which would have been two years after disposition (i.e., when appellant would have been over 40 years old). (See Welf. & Inst. Code, §§ 607, subd. (d). & 707, subd. (a)(3)(B)(i).) Whether the evidence on *that* question militates in

21.

favor or against transfer is for the trial court to decide in the first instance. And the court did not decide that issue here due to its misunderstanding.

Since the record does not "clearly indicate" how the court would have ruled if it had understood its discretion, we must reverse the transfer order and remand for reconsideration of that issue.[5] We express no opinion on how the court is to rule on the transfer request on remand. (See, e.g., *C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1037.)

## DISPOSITION

The order transferring appellant to criminal court is reversed, and the matter remanded for the court to reconsider the prosecution's motion to transfer in a manner consistent with this opinion.

LEVY, Acting P. J.

WE CONCUR:

PEÑA, J.

MEEHAN, J.

---

[5] As a result of these conclusions, we do not reach any remaining arguments of the parties.